In the
United States Court of Appeals
For the Seventh Circuit

No. 98-3306

EDWARD L. MORRIS,

Petitioner-Appellant,

v.

UNITED STATES OF AMERICA,

Respondent-Appellee.

Appeal from the United States District Court
for the Southern District of Illinois.
No. 97 C 331--William L. Beatty, Judge.

ARGUED FEBRUARY 28, 2001--Decided September 4, 2001

Before HARLINGTON WOOD, JR., KANNE, and
ROVNER, Circuit Judges.

ROVNER, Circuit Judge.  Edward L. Morris
is a former officer of Germania Bank who
was convicted of two counts of mail
fraud, 18 U.S.C. sec. 1341, and one count
of wire fraud, 18 U.S.C. sec. 1343, in
connection with Germania's $10 million
offering of subordinated capital notes
("Schnotes"). We affirmed his conviction
on direct appeal in United States v.
Morris, 80 F.3d 1151 (7th Cir. 1996), and
he now brings a sec. 2255 petition
alleging ineffective assistance of trial
counsel. We will not repeat the facts
which are set out in great detail in our
prior opinion, but instead turn directly
to the claim.

In order to establish ineffective
assistance of counsel, Morris must
demonstrate that his counsel's
performance was deficient, and that he
was prejudiced as a result. Strickland v.
Washington, 466 U.S. 668, 687 (1984);
Wright v. Gramley, 125 F.3d 1038, 1041
(7th Cir. 1997). In order to demonstrate
prejudice, the defendant must show that
there is "a reasonable probability that,
but for counsel's unprofessional errors,
the result of the proceeding would have
been different." Strickland, 466 U.S. at
694; Wright, 125 F.3d at 1041. A
reasonable probability is one sufficient

to undermine confidence in the outcome. Id. at 1041-42.

The crux of the case at trial was that the bank had conducted an in-depth quarterly review of the bank's loan port folio in August and September 1987 (the "September Analysis" or "SA"), in which management (including Morris) recommended an additional $9.3 million in loan loss reserves. The trial evidence showed that Morris was aware of and agreed with that SA, that Morris nevertheless failed to disclose that information in selling the Schnotes in 1987 and 1988, and that the offering circular for those Schnotes represented that the current reserves were "adequate." In February 1988, pursuant to recommendations by Peat, Marwick based on a year-end audit, Germania took an additional $9.4 million in reserves, and eventually its financial condition deteriorated to the point that it was placed in conservatorship by the Resolution Trust Corporation and the Schnotes became worthless. Morris argues that his trial counsel was ineffective in failing to reasonably investigate his case, specifically in his counsel's failure to recognize the importance of two documents provided by the government in discovery. The two documents at issue are an internal Federal Home Loan Bank Board memorandum dated October 19, 1987 ("Internal Memorandum"), and a September 30, 1988 letter written by Jimmie New (the "New letter"). We begin with the New letter.

As our prior opinion made clear, Jimmie New was a critical government witness in this case, who himself had pled guilty to fraud. He was one of the principle authors of the SA, and one of three persons in management (Morris and co-defendant Gardner were the other two) who submitted the SA to the Executive Committee of Germania's Board of Directors and recommended increasing the reserves in September 1987. Morris contends that the New letter would have provided "powerful ammunition to impeach the critical component of New's testimony--his contention that it was necessary to immediately recognize an additional nine million dollars of loan loss reserves as set forth in his SA." The letter in pertinent part provided:

The majority of the reserves which were

established in the fourth quarter of 1987 related to the provision for losses on Real Estate Owned of $1.5 million which were deemed necessary by management of the Bank due to some adverse developments on portions of its Real Estate Owned and a substantial increase in Real Estate Owned during the fourth quarter of 1987 as well as recording Provision for Losses on Industrial Revenue Bond Collateralization Agreements of $3.4 million in connection with the default by borrowers under three of these agreements.

New Letter at 6. Morris had testified that events in the fourth quarter necessitated the additional reserves in February 1988, including the stock market crash, and four properties, Westchester, Oak Brook, Silver Springs, and the Ramada Inn at Fairview Heights, that became scheduled items. According to Morris, the Industrial Revenue Bond Collateralization Agreements described in New's letter referred precisely to those properties. Morris contends that the reserves taken in February 1988, although roughly equivalent in amount with the recommendations of the SA, were based on the substantially different asset problems which arose in the fourth quarter. He asserts that the New letter recognizes that, and thus contradicts New's trial testimony to the contrary. Because New's testimony was critical to the conviction, Morris argues that his attorney was ineffective in failing to realize the significance of the New letter and use it in cross-examination.

We need not consider whether there is deficient performance in the failure to use the New letter in this case, because there is no prejudice. See United States v. Depoister, 116 F.3d 292, 295 (7th Cir. 1997) ("[b]ecause the defendant must establish both of these prongs, we can initially address, in reviewing such an ineffectiveness claim, either prong of this test."). Our review of the trial transcript reveals that the New letter was indeed cumulative of testimony elicited on cross-examination by counsel for Morris' co-defendant Gardner. New was questioned regarding those same assets, and acknowledged the developments that occurred in the fourth quarter. For instance, New acknowledged that West Chester was moved from Deed Foreclosure

status into Real Estate Owned status in the fourth quarter, but he further stated that although it happened in the fourth quarter, they were aware of it in the second and third quarter. Under questioning, New admitted that the stock market crash of October 1987 was a very significant event in the fourth quarter. New also agreed that he did not anticipate the way that Peat, Marwick would treat the industrial revenue bond properties, but asserted that the difference was not $3.3 million, but was approximately a million or a million and a half because the SA recommended some of that amount as basket reserves. When confronted with his prior testimony in which he stated that the industrial revenue bond properties of West Chester, Silver Springs, and Oak Brook, resulted in three and a half million of reserves that he had not planned on in August or September, he said that was a true statement. That extensive questioning regarding the developments of the fourth quarter renders the New letter cumulative. New effectively acknowledged the same facts presented in the New letter, and provided an explanation that the jury could choose to credit or not. Because New testified consistently with the statements in the New letter and it was merely cumulative of other testimony elicited on cross-examination, New was not prejudiced by his attorney's failure to discover or utilize the letter at trial. See Drake v. Clark, 14 F.3d 351, 356 (7th Cir. 1994) (finding no prejudice where omitted testimony was cumulative).

The second document identified as critical by Morris is an October 1987 internal FHLBB memorandum considering and approving Germania's application to issue subordinated debt to Laclede Gas around the time of the sale of Schnotes. Morris specifically points to a portion of that memorandum entitled "Consolidated Cash Flow Forecast Utilizing the $17.5 Million Subordinated Debenture." That forecast indicates that Germania had budgeted an additional eleven million dollars in loan loss reserves for the five-year period from 1987 through 1991. Morris argues that notwithstanding that predicted need for reserves, the FHLBB approved the sale of subordinated debt to Laclede Gas.

That memorandum does not help Morris, and in fact might have worsened his case.

The memorandum effectively corroborates New's contention that Morris was aware at the time the offering circular was issued of the need for a substantial increase in the loan loss reserves. It is furtherevidence that the statement in the offering circular characterizing the current reserves as "adequate" was deceptive at best. Morris appears to argue that the memorandum establishes that they did not attempt to hide the SA from others, and that they supplied the relevant information to the regulators. It does nothing, however, to counter the testimony at trial that the information was not provided in the offering circular or in other material presented to potential Schnote investors, or in the information provided to Laclede Gas. Therefore, the failure of Morris' counsel to discover and use the memorandum did not prejudice Morris.

Accordingly, the decision of the district court is AFFIRMED.