*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

          Plaintiff-Appellee,

v

MARCUS TYREE LASHAWN WALKER,

          Defendant-Appellant.

UNPUBLISHED
August 5, 2021

No. 351789
Washtenaw Circuit Court
LC No. 17-000800-FC

PEOPLE OF THE STATE OF MICHIGAN,

          Plaintiff-Appellee,

v

RICO MONTEZ CHANDLER,

          Defendant-Appellant.

No. 352198
Washtenaw Circuit Court
LC No. 19-000073-FC

Before: FORT HOOD, P.J., and MARKEY and GLEICHER, JJ.

PER CURIAM.

In these consolidated appeals from a joint trial with separate juries,[1] defendants, Marcus Tyree Lashawn Walker and Rico Montez Chandler, appeal by right their jury convictions stemming from the shooting death of Dominique Lee. We affirm in both cases.

---

[1] This Court ordered the appeals to be consolidated for the efficient administration of the appellate process. *People v Walker*, unpublished order of the Court of Appeals, entered February 2, 2021 (Docket Nos. 351789 and 352198).

In Docket No. 351789, Walker appeals his convictions of first-degree felony murder, MCL 750.316(1)(b); armed robbery, MCL 750.529; conspiracy to commit armed robbery, MCL 750.157a; MCL 750.529; and knowingly circumventing or interfering with the signal, impulse, or data transmitted by an electronic monitoring device (tampering with a tether), MCL 771.3f(1).[2] The trial court sentenced Walker as a fourth-offense habitual offender, MCL 769.12, to life in prison without the possibility of parole for his murder conviction, to 26 to 40 years for his convictions of armed robbery and conspiracy to commit armed robbery, and to 10 to 15 years for his conviction of tampering with a tether.

In Docket No. 352198, Chandler appeals his convictions of first-degree murder under two theories, premeditated murder and felony murder, MCL 750.316(1); armed robbery, MCL 750.529; carrying or possessing a firearm while ineligible to do so (felon-in-possession), MCL 750.224f(1); carrying a weapon with unlawful intent, MCL 750.226; carrying a concealed weapon, MCL 750.227(1), and four counts of carrying or possessing a firearm during the commission of a felony (felony-firearm), MCL 750.227b. The trial court sentenced Chandler as a fourth-offense habitual offender, MCL 769.12, to life in prison without the possibility of parole for his murder conviction, to 30 to 50 years for his armed robbery conviction, to 4 to 30 years for his convictions of felon-in-possession, carrying a weapon with unlawful intent, and carrying a concealed weapon, and to two years for his convictions of felony-firearm.

On appeal, Walker argues that the prosecution suppressed evidence favorable to the defense, and Chandler argues that the prosecutor admitted Walker's confession as evidence of Chandler's guilt in violation of Chandler's right to confront the witnesses against him. They both argue that these errors deprived them of fair trials and, for that reason, ask this Court to remand for new trials. Again, because we conclude that there were no errors in either case that warrant relief, we affirm in both.

## I. FACTUAL BACKGROUND

In the early morning hours on June 8, 2018, a shooting occurred at an apartment complex in Ypsilanti, Michigan. Video cameras at the complex recorded the entire event and showed that Chandler and Walker drove separately to the complex. Upon their arrival, they walked to an apartment with several other individuals. The evidence established that Walker had arranged for Lee to drive to the complex to sell drugs to Chandler, but that Walker knew that Chandler intended to rob Lee. Walker admitted that he spoke with Lee and instructed him to park in a specific space. The video evidence showed that upon Lee's arrival, Chandler walked up to Lee's vehicle and shot Lee once in the head.[3] Lee died instantly.

After the shooting, Lee's vehicle began to roll forward, jumped the curb, and then came to rest after it struck a porch. The video evidence showed Chandler following the rolling vehicle and

---

[2] The jury acquitted Walker of carrying or possessing a firearm during the commission of a felony, MCL 750.227b.

[3] As indicated below, Chandler takes issue with his identification as the individual that shot Lee in the videorecording.

reaching into the driver's side of the vehicle before eventually moving to the passenger side, breaking the passenger's window, and also reaching inside the vehicle from that side. Chandler then walked to a location behind an apartment where the video evidence showed that Walker had been waiting. The two interacted briefly before Chandler disappeared. Walker then proceeded to Chandler's car and drove it away. Evidence showed that both Walker and Chandler arrived shortly thereafter at the home of Chandler's then girlfriend, Teneca Powell. Chandler gave Powell a bloody handgun and a bag of cocaine and told her to hide them.

## II. WALKER'S APPEAL

## A. SUPPRESSION OF EVIDENCE

Walker first argues that the prosecution violated the rule stated in *Brady v Maryland*, 373 US 83; 83 S Ct 1194; 10 L Ed 2d 215 (1963), when it failed to disclose that a witness, Dorian Diaz, was incarcerated at the time when he claimed he overheard Walker and Chandler planning to rob and kill Lee. Walker maintains that the prosecution had a duty to disclose that evidence because the Department of Corrections had the information. We disagree.

To preserve this claim of error, Walker had to move in the trial court for a new trial or relief from judgment on the ground that the prosecution improperly suppressed the evidence that Diaz was incarcerated throughout the time that any conversation between Chandler and Walker could have been overheard. *People v Burger*, 331 Mich App 504, 516; 953 NW2d 424 (2020). Walker did not do so; therefore, this claim of error is unpreserved. *Id*. This Court reviews de novo whether the prosecution violated due process by suppressing evidence favorable to the accused. *People v Dimambro*, 318 Mich App 204, 212; 897 NW2d 233 (2016). This Court, however, reviews unpreserved claims that the prosecution violated due process by suppressing evidence for plain error. *Burger*, 331 Mich App at 516. In order to establish his right to relief, Walker must show that there was an error, that the error was plain or obvious, and that the error affected the outcome of the lower court proceedings. *Id*.

It is well-settled that the prosecution has an affirmative duty to disclose evidence that is favorable to the defense—whether because it is exculpatory or could serve to impeach a prosecution witness—if the evidence is material either to guilt or punishment. *Kyles v Whitley*, 514 US 419, 432-433; 115 S Ct 1555; 131 L Ed 2d 490 (1995); *People v Chenault*, 495 Mich 142, 149-150; 845 NW2d 731 (2014). The defendant must demonstrate that the prosecution suppressed evidence, that the evidence was favorable to him or her, and that the evidence was material. *Chenault*, 495 Mich at 150.

To establish that the prosecution suppressed evidence, Walker must demonstrate that the prosecution failed to disclose "known, favorable evidence." *Kyles*, 514 US at 438. Generally, the prosecution does not have a constitutional obligation to search for evidence that might support the defense. See *Dimambro*, 318 Mich App at 213. That being said, the prosecution does have a duty to "learn of any favorable evidence known to the others acting on the government's behalf in the case, including the police." *Kyles*, 514 US at 437. For that reason, courts will hold the prosecution responsible for the failure to disclose evidence within the control of others, even if actually unknown to the prosecution, if the prosecution had a duty to learn of the evidence because the other person acted on the government's behalf in the particular case. See *Dimambro*, 318 Mich

App at 214-215 (holding that evidence in the control of the medical examiner may be imputed to the prosecution because medical examiners are required to work closely with the prosecution in cases involving unexpected or violent deaths).

As noted, on appeal, Walker contends that the prosecution suppressed evidence that Diaz was incarcerated throughout the time when he could have overheard any conversation between Walker and Chandler. More specifically, he maintains that the Department of Correction's knowledge that Diaz was still incarcerated should be imputed to the prosecution.

The prosecution did not have an obligation to learn information possessed by other governmental agencies which had no involvement in the investigation or prosecution of its case. See *United States v Pelullo*, 399 F3d 197, 216-218 (CA 3, 2005) (holding that evidence collected by civil investigators could not be imputed to the prosecution because the civil investigators played no role in the criminal case); *United States v Morris*, 80 F3d 1151, 1169-1170 (holding that the prosecution had no duty to learn about information held by other agencies, such as the Office of Thrift Supervision, the Securities Exchange Commission, or Internal Revenue Service, because those agencies were not involved in the investigation or prosecution at issue).[4] The Legislature established the Department of Corrections to secure persons committed to its jurisdiction: it provided the Department with exclusive jurisdiction over probation, paroles, penal institutions, and electronic monitoring. See MCL 791.204. By contrast with the statutes governing medical examiners, the Legislature did not charge the Department with the general obligation to investigate crimes or assist the prosecution in particular cases. Cf. *Dimambro*, 318 Mich App at 213-215. To that end, there is no evidence that the Department participated in Walker's investigation or prosecution whatsoever. In the absence of such evidence, the information held by the Department cannot be imputed to the prosecution. See *Kyles*, 514 US at 437; *Dimambro*, 318 Mich App at 215. Consequently, the prosecution did not plainly or obviously violate due process by failing to disclose favorable evidence about which it did not know and had no obligation to learn. See *Burger*, 331 Mich App at 516. Moreover, even if it were plain error for the prosecution to fail to investigate and disclose Diaz's status with the Department, Walker fails to show that the plain error would warrant a new trial.

Assuming that the evidence would show that Diaz had in fact been incarcerated throughout the time within which he could have overheard a conversation between Walker and Chandler, the evidence would be favorable to the defense. Diaz testified that he heard Chandler have a conversation with a man that he thought was Walker, although he was somewhat equivocal about Walker's identity as the other participant. Diaz was also vague about the timing of the conversation that he overheard—he could not state whether the participants were talking about a robbery and killing that they were planning or that had already occurred. Indeed, he stated that it "could have been that he was already dead and they was trying to get rid of the gun." He clarified that he did not "know for sure" whether they were talking about "killing, or somebody being killed." Nevertheless, he was clear that Chandler and the other man—whom he repeatedly stated that he thought was Walker—were either planning to kill Lee and rob Lee of cocaine, or stated

---

[4] Although decisions by federal lower courts are not binding on this Court, we may rely on them as persuasive authority. *Abela v Gen Motors Corp*, 469 Mich 603, 606; 677 NW2d 325 (2004).

that they had killed and robbed Lee. Accordingly, Diaz's testimony lent weight to the other evidence that tended to show that Walker knowingly arranged the drug transaction between Chandler and Lee to enable Chandler to rob or kill Lee. Evidence that Diaz was incarcerated until after Walker's arrest would have shown that Diaz could not have overheard a conversation between Chandler and Walker—either before the shooting or after the shooting and before Walker's arrest—because Diaz was not released until after Walker had been arrested. Consequently, such evidence would have constituted significant impeachment evidence. See *Burger*, 331 Mich App at 517. It was not, however, material.

Evidence is material when there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different. See *Chenault*, 495 Mich at 150. A reasonable probability is one that is sufficient to undermine the confidence in the outcome. *Id*. Additionally, because this case involves an unpreserved claim that the prosecution suppressed evidence favorable to the defense, Walker has the added burden to show that the suppression of the evidence actually affected the outcome of the trial. See *Burger*, 331 Mich App at 516.

The jury understood that Diaz's testimony had credibility issues. Diaz admitted that he had had only limited contact with Walker since high school, that he never graduated from high school and did not recall when he left school, that he was involved with drugs and guns, and that he had a motive to frame his recollections to conform to the prosecution's theory of the case in the hope that he might get his own sentence reduced. Diaz was also vague and inconsistent about both the timing of the conversation that he purportedly overheard, and about whether Walker was the other participant to the conversation with Chandler. That being said, his testimony—even when impeached by the evidence of his incarceration—was still admissible in Walker's trial because Chandler's statements were not testimonial and were contrary to Walker's penal interests. See *People v Taylor*, 482 Mich 368, 378-380; 759 NW2d 361 (2008) (holding that nontestimonial statements by a codefendant that implicate the defendant may be admissible under the exception for statements against penal interest). Diaz's testimony about Chandler's inculpatory statements provided context for the motive and planning of the robbery and shooting even without establishing that Walker was the other participant and even if the conversation occurred after the shooting. A reasonable jury could infer that Diaz overheard a conversation between Chandler and another man after the shooting and, from that, it could conclude that Chandler described the circumstances of the robbery and shooting. When considered with the evidence of Walker's statements to police officers about his role in enticing Lee to the scene of the shooting, Diaz's description of the conversation bolstered the inference that Walker knew Chandler intended to rob and shoot Lee and still agreed to assist him. See *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002) (holding that, when evidence is relevant and admissible, it does not matter that the evidence gives rise to multiple inferences or that the inferences to be drawn give rise to further inferences). For that reason, the impeachment would not have deprived Diaz's testimony of all probative value.

Walker's statements—when considered in conjunction with the video evidence and Powell's testimony—amounted to powerful evidence that Walker conspired with Chandler to commit armed robbery, aided and abetted Chandler's commission of the armed robbery, and had the requisite intent to be found guilty of felony murder arising from his aiding and abetting of the armed robbery. See *People v Robinson*, 475 Mich 1, 6-7; 715 NW2d 44 (2006) (defining the *mens rea* applicable to aiding and abetting as, in part, the intent to commit the crime aided and abetted

or knowledge that one's accomplice had the intent to commit the crime); *People v Aaron*, 409 Mich 672, 727-728; 299 NW2d 304 (1980) (holding that the prosecution must prove—in relevant part—that a defendant acted in wanton and willful disregard of the likelihood that the natural tendency of defendant's behavior was to cause death to establish that a killing that occurred during the commission of a felony amounted to felony murder); *People v Hart*, 161 Mich App 630, 636; 411 NW2d 803 (1987) (stating that evidence concerning the circumstances under which a defendant aided and abetted an armed robbery can establish that the defendant acted in wanton and willful disregard of the natural tendency of the acts to cause death). Walker made multiple statements to two detectives. He stated that he ran into Lee earlier in the day before the night of the shooting and learned that Lee wanted to sell cocaine. He also admitted that he spoke with Chandler that same day and told Chandler about Lee. Chandler responded that he would be hanging out at the apartment complex at issue, and Walker agreed to talk with Chandler later— presumably about Lee. Walker later arranged the meeting between Chandler and Lee even though he knew that Chandler intended to rob Lee. In fact, Walker told Detective Michael Babycz that he knew that Chandler intended to "get his ass"—referring to Lee—if he got the opportunity, which suggested that Walker knew that Chandler intended to do more than just rob Lee. Walker also knew that Chandler always carried a handgun. Walker described Chandler as a dangerous guy who intended to rob Lee, and he admitted that he used foil to defeat his tether's tracking capabilities. Detective Annette Coppock stated that Walker also told her that Chandler told him, "If I can get down on him, I'm gonna get that ass," which again suggested that Walker knew that Chandler intended to shoot Lee.

The video evidence showed that Walker arrived at the apartment complex at about the same time as Chandler and that he and his companion walked toward an apartment a short distance behind Chandler and his group. Walker admitted that he went into an apartment where Chandler was present. Phone records showed that Walker was repeatedly communicating with Lee at that time, and Walker told detectives that he directed Lee to the complex and identified the place where he should park. Video evidence also showed Lee moving his car throughout the parking lot during the relevant times, which permitted an inference that Lee was acting on Walker's instructions.

The video evidence further depicted Chandler meeting with Walker before the shooting and immediately after the shooting. The video then showed Walker driving Chandler's car from the complex, and Walker admitted that he drove to an area near Powell's residence. Powell testified that a man was with Chandler when Chandler woke her and handed her a bloody gun and cocaine. That man, she related, poked his head in the room and told Chandler that he needed to get going because his tether was going off. From that, the jury could infer that Walker was with Chandler and picked up Chandler in Chandler's car and drove him to Powell's home. That evidence allowed the jury to infer that Walker and Chandler coordinated their activities both before and after the shooting, and suggested that Walker had to have known that Chandler robbed and killed Lee.

Taken together, the evidence of Walker's guilt was overwhelming. The evidence showed that, despite knowing that Lee was armed and intended to rob Lee or otherwise "get his ass," Walker arranged for Lee to meet Chandler at the apartment complex, called Lee and directed him to the point where Chandler eventually ambushed him, waited in a particular location during the shooting and robbery, met with Chandler immediately after the shooting, and then assisted Chandler with his escape from the area. Given the totality of the evidence, even if Walker's lawyer

had impeached Diaz with the evidence that Diaz could not possibly have overheard a conversation between Chandler and Walker, that impeachment would not have altered the outcome. Consequently, Walker fails to demonstrate plain error that warrants a new trial. See *Burger*, 331 Mich App at 516.

Indeed, the evidence was so strong that, even if Walker had not forfeited this claim of error, it still would not warrant relief. Diaz's unimpeached testimony was the strongest evidence that Walker agreed to kill Lee, but the jury clearly rejected the contention that Walker premeditated Lee's murder. The jury could only have reached that conclusion if it discounted Diaz's credibility even without the additional impeachment. When the evidence of premeditation is discounted, Diaz's testimony only served to bolster the other evidence that Walker knowingly assisted Chandler with his plan to rob Lee. On this record, there is no reasonable probability that, had Walker been able to further impeach Diaz, the result of the proceeding would have been different. See *Chenault*, 495 Mich at 150. Because the failure to disclose the impeachment evidence did not render the verdict unworthy of confidence, the impeachment evidence was not material and would not warrant a new trial. *Id.* at 150-151.

## B. INEFFECTIVE ASSISTANCE

In the alternative, Walker argues that defense counsel's failure to discover the same evidence amounted to ineffective assistance of counsel that warrants a new trial. More specifically, he asserts that defense counsel only checked the Offender Tracking Information System (OTIS) when he should have contacted the Department of Corrections to determine whether Diaz was incarcerated during the relevant time. We disagree.

Whether defense counsel was ineffective involves a mixed question of fact and law. *People v Gioglio (On Remand)*, 296 Mich App 12, 19; 815 NW2d 589 (2012), vacated in part on other grounds 493 Mich 864 (2012). This Court reviews de novo whether a particular act or omission fell below an objective standard of reasonableness under prevailing professional norms and prejudiced the defendant's trial. *Id*. at 19-20. Because the trial court did not hold an evidentiary hearing to expand the record to include additional evidence concerning defense counsel's investigation, this Court's review is limited to mistakes apparent on the record. *People v Sabin (On Second Remand)*, 242 Mich App 656, 658-659; 620 NW2d 19 (2000).

In order to establish his claim of ineffective assistance, Walker had to demonstrate that defense counsel's failure to investigate fell below an objective standard of reasonableness under prevailing professional norms and that, but for his failure to investigate, there was a reasonable probability that the outcome would have been different. *Gioglio*, 296 Mich App 22. Defense counsel had an obligation to conduct a reasonable investigation to support Walker's defense: defense counsel had to "make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary." *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012) (quotation marks and citation omitted). The failure to conduct an adequate investigation is an omission that falls below an objective standard of reasonableness under prevailing professional norms. *Id*. at 52-53. Nevertheless, even assuming that it fell below an objective standard of reasonableness under prevailing professional norms to search only OTIS to determine whether Diaz was incarcerated during the events at issue, Walker has not shown that

the failure to discover that Diaz was still incarcerated during the only period within which he could have overheard a conversation between Chandler and Walker prejudiced his trial.

Again, there was overwhelming evidence that Walker agreed to set up the drug transaction to enable Chandler to rob Lee. There was also strong evidence that Walker knew that Chandler intended to shoot Lee or, at the very least, that he acted in reckless disregard of the likelihood that Chandler would shoot Lee during the robbery. For that reason, even if defense counsel had impeached Diaz's testimony and shown that it was impossible for Walker to have been the person with whom Chandler spoke, it is not reasonably probable that the additional impeachment would have altered the outcome of the lower court proceeding. See *Gioglio*, 296 Mich App 22.

With all of the above in mind, Walker has not identified any errors that warrant a new trial.

### III. CHANDLER'S APPEAL

Chandler argues on appeal that the prosecution violated his right to confront the witnesses against him by asking him to comment on the evidence that Walker made a statement to police officers in which he stated that Chandler shot Lee. The prosecutor's question, he argues, "revealed" evidence that Chandler's jury should never have heard in violation of the rule stated in *Bruton v United States*, 391 US 123; 88 S Ct 1620; 20 L Ed 2d 476 (1968). We disagree.

To preserve this claim, Chandler had to make a contemporaneous objection to the admission at trial on the ground that it violated his right to confront Walker. *People v Pipes*, 475 Mich 267, 277-278; 715 NW2d 290 (2006). Likewise, to the extent that Chandler has asserted a claim of prosecutorial misconduct, Chandler had to make a contemporaneous objection. *People v Callon*, 256 Mich App 312, 329; 662 NW2d 501 (2003). Chandler did neither. He first raised this claim of error at sentencing, and later in a motion before the trial court. Because Chandler did not make a contemporaneous objection, the trial court did not have the opportunity to correct the error at trial and the claim is unpreserved. See *Pipes*, 475 Mich at 277-278. This Court reviews de novo both claims involving constitutional error and claims that a prosecutor's misconduct deprived the defendant of a fair trial. *People v Clark*, 330 Mich App 392, 428; 948 NW2d 604 (2019). However, we review unpreserved claims of error for plain error affecting the defendant's substantial rights. *Pipes*, 475 Mich at 279.

The Supreme Court of the United States has held that it is a violation of the Sixth Amendment right to confront witnesses to admit a codefendant's testimonial statement incriminating the defendant at a joint trial, even if the trial court properly instructs the jury that the statement is inadmissible against the defendant. See *Bruton*, 391 US at 126. In *Bruton*, the Court explained:

> [T]here are some contexts in which the risk that the jury will not, or cannot, follow instructions is so great, and the consequences of failure so vital to the defendant, that the practical and human limitations of the jury system cannot be ignored. Such a context is presented here, where the powerfully incriminating extrajudicial statements of a codefendant, who stands accused side-by-side with the defendant, are deliberately spread before the jury in a joint trial. Not only are the incriminations devastating to the defendant but their credibility is inevitably

suspect, a fact recognized when accomplices do take the stand and the jury is instructed to weigh their testimony carefully given the recognized motivation to shift blame onto others. The unreliability of such evidence is intolerably compounded when the alleged accomplice, as here, does not testify and cannot be tested by cross-examination. It was against such threats to a fair trial that the Confrontation Clause was directed. [*Id.* at 136 (citations omitted).]

In this case, Walker's testimonial statements to officers were not admitted before Chandler's jury; they were admitted before Walker's jury alone. For that reason, the trial court did not improperly allow the admission of Walker's testimonial statements in violation of the rule stated in *Bruton*. Nevertheless, Chandler's jury did hear that Walker told officers that Chandler admitted that he shot Lee through the cross-examination of Chandler.

After Chandler took the stand and testified that he was not the person who shot and killed Lee, the prosecution cross-examined Chandler about the apparent contradiction between Chandler's testimony and the testimonies by other witnesses that Chandler admitted that he shot and killed Lee:

*Q*. Mr. Chandler, you stated you didn't shoot anybody that day on June 8th, 2017?

*A*. That's correct, sir.

*Q*. Okay. You've heard—did you—you heard Dorian Diaz testify under oath that you told him that you shot Dominque Lee, correct?

*A*. Yes, I heard him testify to that.

*Q*. You heard Teneca Powell testify under oath that you've told her numerous times that you shot and killed Dominique Lee, is that correct?

*A*. Yes, that is correct.

*Q*. You're present in the courtroom and you heard that your very own co-Defendant, Mr. Walker, told the police that you told them that you shot and killed Dominque Lee as well, correct?

*A*. Yes, that's correct.

*Q*. Why do you think your co-Defendant, Mr. Walker, would tell the police that you told him that you shot Dominique Lee?

*A*. That was—

*Mr. Burgess*: Objection.

*Witness Chandler*: That would—

*Mr. Burgess*:  Speculation.

*Witness Chandler*:  —cause me to speculate, so I can't answer because I don't know.

After eliciting that response, the prosecution asked Chandler about the apparent similarities between the person, whom the video showed shooting Lee, and Chandler.  Chandler admitted that that person arrived at the apartment complex in a red Chevy Impala that had a sun roof, just like Chandler's red Chevy Impala.  He refused, however, to concede that the man wore a Red Wings jacket identical with his Red Wings jacket and wore cargo shorts like the ones he wore on the day at issue.  Chandler agreed that the man in the video wore glasses, as did he, but he did not admit that the man in the video had a similar hairline because he did not know what his own hairline looked like.

The prosecution next asked Chandler whether all the evidence amounted to coincidence:

*Q*.  So Mr. Chandler, is it a coincidence that the individual who shot Mr. Lee drove a car identical to yours, [wore] a jacket identical to yours, [had] the same build, hairline, glasses and looked like you?  Is that all a coincidence?

*A*.  I mean, you can infer how you want.  I look at it like this.

*Q*.  I'm asking—

*A*.  But that's because—

*Q*.  —you yes or no?

*A*.  Throw it to the wall, throw enough charges.  If it sticks, good.  If not, we tried.  I mean, like—

*Q*.  Again, I'm gonna ask you yes or no.  Is it—

*A*.  It's cool.

*Q*.  —a coincidence that the individual who shot Mr. Lee looks like you, walks like you, wears a jacket identical to you, glasses, same build, and drives an identical car as you?

*A*.  Well, if for that, yes.  Coincidence, yes.

*Q*.  It's all a coincidence.

*A*.  I mean, I wouldn't call it more than a coincidence, but use your phrase, coincidence.

*Q*.  And no explanation as to why Teneca Powell, Dorian Diaz and your very own co-Defendant would say that you admitted to them that you shot Mr. Dominque Lee?

*A.* When I tried to answer that, you cut me off. You stopped me.

*Q.* Okay. So is that just a coincidence that all three of them are saying that you told them that you shot Dominique Lee?

*A.* I wouldn't call it a coincidence. I'd call it a coerced story.

*Q.* All three of them?

*A.* One, Mr. Diaz—

*Q.* I'm—yes or no. All three?

*A.* Like I said, I wouldn't even call it a coincidence.

*Q.* Yes or no?

*A.* I'd call it a coerced story.

*Q.* But coerced story on all three of them?

*A.* Yeah. Two in trouble. One is scorned. I mean, yeah. I'm sorry to say it, but people in trouble, you live the lifestyle we live. Everybody knows if you get in trouble, if I can try to get somebody else up, it helps me. When this whole case started, my name came up—

*Q.* Okay.

*A.* Everybody wanted to come at me.

As can be seen, there was never any admissible testimony before the Chandler jury that Walker said that Chandler told him that he shot Lee. The only indication that Walker had made such a statement to officers was from the prosecution's questions to Chandler. But the prosecution's questions, as the trial court instructed the jury, were not evidence. See *People v Mesik (On Reconsideration)*, 285 Mich App 535, 541; 775 NW2d 857 (2009). As such, it is not clear that there was an evidentiary admission in violation of the rule stated in *Bruton*. Rather, the issue appears to be more akin to prosecutorial misconduct involving questions that serve as the functional equivalent of testimony, which may violate the right to confrontation. See *Clark*, 330 Mich App at 429. Nevertheless, both types of error can be harmless. *Pipes*, 475 Mich at 279; *Clark*, 330 Mich App 429-431.

The prosecutor's questions were obviously improper and implied that Walker had implicated Chandler. However, even if Walker's statement had been improperly admitted before Chandler's jury, this Court would have to weigh the evidence that was properly admitted against the improperly admitted evidence to assess whether it was harmless. See *Pipes*, 475 Mich at 280. The prosecutor could properly ask about the testimonies by Diaz and Powell, who both told the jury that Chandler admitted that he shot Lee. Powell specifically told the jury that Chandler admitted that he shot Lee on multiple occasions. Taken as a whole, the prosecutor's improper

question about Walker's statements was not unduly prejudicial and could have been readily cured by an instruction had Chandler objected. See *People v Unger*, 278 Mich App 210, 235; 749 NW2d 272 (2008) ("Curative instructions are sufficient to cure the prejudicial effect of most inappropriate prosecutorial statements."). That is, weighed against the overwhelming evidence of Chandler's guilt, we cannot conclude that the improper inferences occasioned by the questions prejudiced Chandler's trial.

The video cameras at the apartment complex captured the events at issue. The images showed several persons arriving, walking about the complex, and meeting at various points. There was also no doubt that one of the men shot and killed Lee, walked alongside his car as it rolled forward, broke out a window, and apparently took items from inside. The video evidence alone was sufficient to establish that that man murdered Lee with a handgun and robbed him afterward. The only real issue was whether Chandler was the man seen shooting Lee on the video. See *People v Yost*, 278 Mich App 341, 356; 749 NW2d 753 (2008) (noting that identity is an element of every offense).

At trial, there was evidence that the man who shot Lee arrived in a red Chevy Impala with a sunroof. Chandler owned a red Chevy Impala with a sun roof. Video showed that the man wore a Red Wings jacket, cargo shorts, and glasses. Testimony established that Chandler owned a Red Wings jacket, was wearing cargo shorts on the day at issue, and wore glasses. The man in the video had a peculiar walk, and witnesses testified that Chandler had a similar gait. Testimony and evidence also established that Chandler had the same build and hairline as the man in the video. Several witnesses testified that they actually recognized Chandler as the man captured on the video. The video also showed that Walker drove the red Chevy Impala from the complex immediately after the shooting and after Walker met with the shooter.

Powell testified that Chandler woke her in the early morning hours just after the shooting and handed her cocaine and a bloody gun, which matched the description of the handgun that Lee commonly carried and which was not found with his remains. Powell said that another man was with Chandler, and her testimony about his statement suggested that that man was Walker. Powell testified as well that her car was missing later that morning and that Chandler's red Chevy Impala was in its place in her garage. Powell's testimony helped establish that Walker drove Chandler's red Chevy Impala to her home after the shooting, which further established that it was in fact Chandler's red Chevy Impala depicted on the video. Powell and Diaz also both reported that Chandler admitted that he shot Lee. Taken together, the evidence established beyond any reasonable doubt that Chandler was the man captured on video shooting and robbing Lee. By contrast, the inferences to be drawn from the prosecution's improper questions were minimally prejudicial.

Again, when considered against the overwhelming evidence demonstrating that Chandler shot and killed Lee and then robbed him of cocaine and a gun, it is beyond reasonable dispute that the improper questions were harmless. Cf. *Pipes*, 475 Mich at 283. For the same reason, Chandler cannot establish that he was actually innocent or that the plain error affected the fairness, integrity, or public reputation of the proceedings. See *id.* at 283-284. Consequently, although the prosecution plainly erred by asking Chandler to comment on statements that were not admissible before Chandler's jury, the prosecution's error was harmless. See *id.*

Chandler has not identified any errors that warrant a new trial.

Affirmed in both dockets.


/s/ Karen M. Fort Hood
/s/ Jane E. Markey